Thank you, Your Honor. Zach Lill on behalf of the City of Redmond. With the Court's permission, I'd like to reserve five minutes of my argument time for purposes of rebuttal. Very well. Just keep an eye on the clock. Thank you, Your Honor. As the Court is aware from the briefing in this matter, this case involves a constitutional challenge to the City of Redmond's portable sign ordinance. The City's ordinance establishes a general prohibition on portable signage within the city. Portable signage is defined to include non-permanently affixed structures such as A-boards, sandwich boards, and similar types of signs. Exempt from that general ban are several categories of signage that are allowed but under a time, place, and manner of restrictive framework. These include real estate signs, political signage, some specified types of banner displays, construction signs, and a few other types. The facts of this matter are largely undisputed and we believe that the case involves pure issues of law. Specifically, this case is and should be governed by the U.S. Supreme Court's precedent for commercial speech and the Central Hudson analysis that applies under it. The Central Hudson involves four criteria that must be satisfied for a commercial speech restriction to be valid. The first two elements of that test are undisputed in this case. The City does not challenge the fact that Mr. Ballin's advertising sign involves lawful activity and is not misleading. The appellees in this matter do not contest the City's determination that the traffic safety and community aesthetic goals underlying the City's sign code are in fact substantial government interests within the meaning of the Central Hudson test's second prong. Where the parties strongly disagree is on the third and fourth elements of Central Hudson. Collectively, these two criteria require that the challenged regulation directly advance the City's underlying regulatory goals and second, that the regulation reaches no further than necessary to accomplish those goals. And here is where the City strongly disagrees with Judge Peckman's decision in which she found that those two elements of Central Hudson were not satisfied. We believe that the District Court committed several errors of law in this case and the first and most significant error was the Court's disregard of what we consider to be the controlling precedent for this dispute and that is the U.S. Supreme Court's Metro Media v. San Diego decision, which continues to be the preeminent case in the controlling precedent governing the law of outdoor advertising. Can you help me understand the Metro Media case? As I read that opinion, there are four justices in the plurality and then depending upon which of the remaining pages of the opinion you read, there may be three additional justices who would agree that a city could prohibit all exterior signs if it wanted, but it's what happens in between that is confusing to me in Metro Media. Is it Justice Stevens who speaks for the Court in his concurring and dissenting opinion? In the City's view, Your Honor, there were seven justices in the Metro Media case that determined that as applied to commercial speech, the San Diego ordinance challenged there was valid and that includes Justices White, Marshall, Stewart, and Pout that were part of the main plurality and it also includes Justices Rehnquist and Berger and Justice Stevens who concurred in parts one through four of the Metro Media plurality decision. So combined, in our view, seven justices believed that the restriction at issue there did in fact satisfy central Hudson and for that reason we believe that that is effectively a majority opinion that does and should continue to control the law of outdoor advertising with respect to the present case. If that was true, then why wouldn't the Supreme Court in the Discovery Network on the NewsRack case say that the NewsRacks were one of the exceptions that would be recognized under Metro Media? I think I have difficulty reconciling those two cases. And that's obviously the chief issue in today's appeal, Your Honor, and our response to that is Discovery Networks involved a communicative medium entirely separate from the signs that are issued here. Each particular type of communicative medium must be analyzed as a law unto itself. The Discovery Networks case involved NewsRacks and not signs and the court significantly in the Discovery Networks case deliberately went out of its way to narrow its holding and say specifically that our holding is narrow. The court also went out of its way to reconcile or at least not to overrule the Metro Media decision. The Discovery Networks court acknowledged Metro Media and even more importantly specifically acknowledged the presence of the exemptions to the San Diego ordinance that was involved in Metro Media but did not overrule it. Go ahead. I think that that's very strong evidence and that's in footnote 20 to the Discovery Networks decision that the court as a matter of law continues to view those exemptions as constitutionally de minimis for purposes of central Hudson. So didn't Judge Peckman, to get back to this case, say the exceptions swallow up the rule and don't seem to be rather arbitrary and so let's take the real estate exception. That's clearly commercial speech so you can't have a bagel sign but you can have a bunch of real estate signs and both are commercial. Isn't that more like Discovery Network where they said you're only getting rid of 62 NewsRacks with the commercial speech but you're leaving all these other NewsRacks there so your safety and aesthetic concerns go out the window and your traffic concerns go out the window. Here Judge Peckman said I can't reconcile these exceptions with the purposes that the regulation is trying to advance and then also discuss the Washington case, the Raincoat case. Happily, Your Honor. Again, going back to Discovery Networks, the real issue there was the city of Cincinnati's categorical prohibition on non-commercial NewsRacks with no supporting analysis and without the benefit of controlling precedent which we feel that we have in this case by virtue of the Metro Media decision. Second, isn't it distinguishable simply on the grounds that the Supreme Court found under the third prong that there was no adequate reduction in the sum total of the offending NewsRacks, that there were some 1,500 or 2,000 of them and only 62 were impacted? That's correct, Your Honor, and I was getting to that point. In the court's words, the minimal or paltry extent to which the Cincinnati ordinance had advanced the city's asserted interest was a critical component of the Discovery Network court's conclusion as was the fact that the ordinance in Cincinnati, unlike the Redmond ordinance, had originally been adopted for reasons completely unrelated to the NewsRacks concern there. The ordinance in Cincinnati was actually, in the court's words, an outdated regulation that had originally sought to regulate or ban leafleting or pamphleting. So I think that it's also distinguishable on that case. And to address Judge Huff's question concerning the mattress outlet decision, the 2005 decision of the Washington Supreme Court, I think there are several factors that take that case out of the realm of precedent for the current appeal. The first and most obvious one is that the mattress outlet case involved a 4-4-1 plurality ruling where four justices found that the Kitsap County ordinance did not satisfy the central Hudson standard and four justices in the dissent strongly considered the ordinance challenge there to satisfy central Hudson and they relied strongly on Metro Media for that decision. And the swing justice, Justice Alexander, didn't reach the constitutional issues at all. He instead concluded that the raincoats that were involved in mattress outlet did not constitute a sign within the definition of the Kitsap County Code. So frankly, without a true majority in that case on the constitutional issue, it really does not have any precedential value. So you don't see that as an impediment to the city of Redmond simply reenacting the same ordinance that it had before, assuming that we were to overturn or even if we upheld Judge Peckman's ruling? I don't believe so, Your Honor, again, because that mattress outlet case does not establish any controlling precedent. The mattress outlet decision involved an as-applied challenge rather than a facial challenge to the Kitsap County ordinance, and the true holding in that case was not so much an invalidation of the county's ordinance. It was simply a dismissal of the citations against the challengers in that case. So I don't see that as an impediment. Well, the chief justice in the mattress outlet case did concur in the judgment, which I think could be fairly interpreted to declare that the ordinance was unconstitutional. Are you going to restrict it to just the dismissal of the citations alone? My construction of that case was that it held the ordinance invalid and unconstitutional as applied in that case, unlike a facial challenge, and that I think is distinguishable from this case. I would also note for the court's information that one of the justices in the controlling plurality is no longer on the court. So I believe that at best the – But he doesn't want us to go back and count doses every time he changes the Supreme Court. No, that's true, Your Honor, but I think it is a fact that weighs in favor of our position that the city can, in fact, reenact its ordinance. I would also note for the court's information that the Washington Supreme Court has not established any precedent demonstrating that the Washington Constitution allows greater or separate independent protection for commercial speech than the federal analysis. And as we pointed out in our briefing repeatedly, the federal case law, in our opinion, particularly the Metro Media decision and the Ninth Circuit's 1988 National Advertising Company case have upheld ordinances that are functionally identical to the ordinance challenged here. So I believe that unless the Washington Supreme Court was to depart from its earlier holding that the Washington Constitution does not offer independent protection for commercial speech, that those federal cases would continue to control. And as I explained, it's our view that the district court in this case made several errors of law. The first was her construction of the ordinance involved in the Metro Media decision. The district court acknowledged that that case did involve several exemptions to a sign code or a general prohibition on a particular type of signage. But then Judge Beckman concluded that the exemptions there were not challenged in the same way that the exemptions in the Redmond case are being challenged. And with all respect to the district court, that is a facially erroneous reading of the Metro Media decision. The Supreme Court in Metro Media specifically addressed and rejected an under-inclusiveness argument under central Hudson's third prong, virtually identical to the argument now advanced by Mr. Ballin. And for that reason, we believe that component of Metro Media should on its face control the outcome of our case. Counsel, do we have any numbers we can put on anything here? Do we have any idea how many signs are affected, how many signs come under the exceptions, how many total signs you may be talking about? I don't believe so, Your Honor, and I would, again, point back to Metro Media where the Supreme Court noted that there was a meager record involved in that case as well. But I think this could... At least that number is the total number of billboards in California, or in San Diego, has some ideas to how much they were worth and what the life expectancy of all of that. Of course, we're talking about sandwich boards and handheld signs here. Do we have any idea how many total signs, just on a percentage basis, how many signs are covered by the exceptions? Are we just covering 50% of the signs now because of the huge real estate exception? I don't believe the record conclusively speaks to that. But, again, it's our position that an ordinance patterned after the one upheld in Metro Media is facially valid as a matter of law without that sort of supporting evidence. What if we thought that the evidence suggested that the exceptions permitted, let's say, 65% of the total signs? So two-thirds of all signs were now permitted under the ordinance and we only had one-third that were prohibited. I still believe that under that hypothetical, Your Honor, that the ordinance still would satisfy the central Hudson... How low do I have to go to make it probably unlawful? I don't believe that that has been definitively hashed out through case law. What we know is that an ordinance that prohibits only a paltry or minute percentage of signs, such as the news racks at issue in the Discovery Network's case, would not satisfy Central Hudson. But there is no evidence in the record before this Court that a similar egregious, lopsided, proportionate count is involved in this case. But all we really have are the conclusions of the city's code enforcement officer that she thinks that there has been a significant proliferation in signs since the injunction went into effect. But there's no foundation for that conclusion in the record, is there? Well, going back to that specific declaration, Your Honor, we believe that her observations should be given the weight that they appropriately do, and we disagree as part of our appeal with Judge Peckman's projection of that declaration on evidentiary grounds. But I think that the larger issue... But even if we were to find an abuse of discretion in the district court's refusal to admit that declaration, isn't she still free to reach the conclusion in assessing the weight to be given to it and say that it's entitled to very little weight because there just isn't anything in there other than the code enforcement officer's bald conclusions or assertions? I would agree that the district court does have that discretion, but I don't believe that that's the situation here. In my reading of the district court's summary judgment order, she held that information inadmissible. She didn't simply assign a little weight. But even if it's admissible, what's it worth is what I'm asking you. You're unable to answer Judge Bybee's question, which the Supreme Court found significant in discovery networks, as to exactly how many signs are affected or impacted by this ordinance. And I don't see anything in the code enforcement officer's declaration that helps answer that question. Well, Your Honor, again, this goes back to the precedent that has grown up around the Metro Media decision and our strong belief that no such supporting evidence is necessary. So we simply have to defer to the legislative judgment of the city council and the planning commission that this does have a beneficial impact under the third and fourth prongs, and that's good enough. In short, yes, Your Honor, I do believe that that is true. And I think that that's the plain holding of the Ackerley v. Crocella's decision, this court's 1997 ruling that involved a very similar challenge to the one involved here based on the alleged under-inclusiveness of the city of Seattle's sign ordinance. And the court in that case held that as a matter of law, an ordinance substantially similar to the one involved in the Metro Media decision is facially valid and directly advances the city's regulatory interests, notwithstanding the absence of statistical proof. And I think that that, if nothing else, should control the outcome here. Mr. Lowell, if I'm looking, if I'm reading the Ferris Declaration correctly, in paragraph 5, she says, in my professional judgment, experience, and observation, the signs subject to the city's ban represent both a significant amount and percentage. And then set off by dashes, she has the phrase, if not an outright majority. Are we to read into that that she thinks that it's about 50-50, that we've suppressed about 50 percent of the signs in the city of Redmond? Not necessarily, Your Honor. In the city's viewpoint, this sort of statistical analysis simply was not necessary. I'm trying to figure out what I can get out of this declaration. I'm trying to get something out of this declaration. What does she mean by that phrase, if not an outright majority? I believe that she means that at least a significant percentage of the signs covered by the city's portable sign prohibition would constitute She seems to suggest that significant amount and percentage could be something less than 50 percent, doesn't it? That's one reading of that, Your Honor. 40 percent would be significant. But she thinks it's an outright majority. So it does suggest that to the extent that we've got any evidence whatsoever, that we think that there's about 50 percent of the signs is what this ordinance now covers. That is a fair reading of that declaration. It's not necessarily the one that the city would advance here. And again, going back to the discovery of So you don't have any other evidence other than the Ferris Declaration? There's the deposition testimony of the city's former community development director, Roberta Lewandowski, that testified as to the effectiveness of the city's portable sign regulations, and that was unaddressed and uncontested by the district court below. Can't the district judge, on the exercise of discretion on an evidence issue, conclude that since the declaration says in my professional opinion that this is more akin to an expert and that under Daubert there has to be some underlying foundation, and so the district judge appropriately asked, was it based on a survey? Was it anecdotal? What is it based on? And then exercising her discretion, properly excluded it. In our opinion, Your Honor, the district court abused its discretion because the declaration of Ms. Ferris clearly laid out the foundation in that she herself has observed this and her professional How? How? That she knows all? But we get what Judge Bidey is saying. We have nothing to base that on. We don't know how many signs she saw before, after. Your Honor, I think that the Ferris Declaration itself was addressing primarily the proliferation of signage that had occurred after the district court had entered its preliminary injunctive order. Well, didn't she admit that the district judge admitted all the photographs? So, I mean, if there was a proliferation, couldn't we see it? I believe that the photographs do demonstrate or help to demonstrate that fact, Your Honor. I think you'll have to stop at this point. I'll give you a little time on rebuttal, but I would like to hear from Mr. Ballin's lawyers. Thank you, Your Honor. Thank you, Mr. Ballin. Your Honors, may it please the Court. My name is Steve Simpson. I'm with the Institute for Justice. We represent Dennis Ballin and Blazing Bagels in this case. Your Honors, Mr. Ballin's challenge to the Redmond sign ban is based on the simple principle that he and other businesses in Redmond have every much as a right to call and direct customers into their businesses as any establishment, any business, and any seller in Redmond. Are you making an equal protection argument, counsel? No, no, Your Honor. We're making a content-based, or we're actually, our primary argument, Your Honor, is squarely under central Hudson. We think that that is the simplest and most fundamental way to uphold district courts. Go ahead. I was just going to say that we do believe that because of the content-based distinction, strict scrutiny would apply. We recognize that that's not the ground on which the district court ruled in our favor, and this court can squarely affirm the district court under a simple central Hudson. If that's the case, then how do you address the effect of metro media? I mean, it seems to me seven justices of the Supreme Court essentially said in metro media, you could prohibit all off-site commercial signage in the city if you wanted to, and that would not offend the First Amendment. A few points, Your Honor. First, the Supreme Court made clear in the Discovery Networks case, which Your Honors have discussed, that the fact that whether or not a city may be able to, in that case it was banned, all news racks, does not mean that if the news racks are allowed, it may then make content-based distinctions among the various types of news racks. So we think that claim in metro media that they hypothetically might have been able to ban an entire class of signs doesn't mean that they can ban some signs and not others solely on the basis of content. So that's the first answer to your point. Secondly, Your Honor, we – But that does sound like an equal protection argument. You don't want to use the words, but that's what you're arguing. Well, Your Honor, actually, the Supreme Court has recognized the similarity of equal protection arguments and content-based speech arguments. I think the – I'm not sure we cited the case in our briefs, but the City of Chicago Police Department v. Mosley did say that when a city favors some speech over others, whether you consider an equal protection claim or a content-based speech claim, it ultimately comes out in the same place. So we don't – we're not making an equal protection argument simply because the First Amendment provides plenty of grounds for us to argue that this law is unconstitutional. But I want to get back, Judge Tallman, to your metro media point, because we strongly disagree with the city's claim that metro media is squarely on point here. Metro media is substantially different from this case on a number of grounds. I've mentioned one already, but the primary reason – actually, two primary reasons metro media is different is, number one, the Supreme Court made crystal clear that in that case they were dealing with the law of billboards and that it was very significant that the city of San Diego was wrestling with how do we deal with very large structures affixed to the ground and concrete, built out of structural steel, that the court actually made clear are – it's sometimes much more akin to buildings than they are to signs. So it made sense in that context for the Supreme Court to give a certain amount of discretion to the city to deal with these enormously large structures that unquestionably have an impact on aesthetics and safety. The same is not true when you're dealing with small temporary signs. Plus, Your Honor, as this Court, as the Ninth Circuit has made clear in a number of cases, the on-site versus off-site distinction that was really the basis of the Supreme Court's holding with respect to commercial speech in metro media is not a content-based distinction. It is a location-based distinction. The Ninth Circuit has made that clear in the Clear Channel case, I believe in the Outdoor Systems case, and in the Ackerley case. Mr. Simpson, I could follow you except that the Supreme Court in metro media specifically referenced the fact that there were exemptions in the San Diego Ordinance which were permissible. And so some off-site commercial signage is okay. And doesn't that directly apply to the situation here, that some types of commercial speech can be forbidden, but others may be permitted in the judgment of the legislature of the city? No, Your Honor, for a couple reasons. First, the Supreme Court actually dealt with that argument in the Discovery Networks case, and referring to the same footnote that opposing counsel referred to, I think it was footnote 20. In Discovery Networks, the Court made clear that that on-site versus off-site distinction was not a content-based distinction. It was not a distinction that essentially favored some speech over others. It was more a locational distinction. And as the Supreme Court stated, metro media does not stand for the proposition that a city may make a distinction between, in that case it was non-commercial, certain types of news racks and others based solely on the content. So we think that what the Court was saying there is, look, a city can make a distinction based on location, on-site versus off-site. But it can't do something like, say, all real estate off-site billboards are allowed, but other types of billboards that advertise other contents are not allowed. That's not what metro media stands for. Moreover, Your Honor, I think there's support in the metro media case for that proposition. That is, while the Supreme Court did use the word – Mr. Simpson, you've got me confused. I'm looking at the language of footnote 20 in the Discovery Networks case, and it seems to me that that's exactly what the Supreme Court is talking about, the distinction between regulation of commercial versus non-commercial speech. They're not questioning the right of a city to regulate and to forbid certain forms of commercial speech off-site. But you seem to be arguing just the opposite, and now I'm confused. Well, maybe I'm not understanding your question. Let me try to put it more clearly. You're trying to distinguish metro media, and I'm looking at footnote 20, and I don't see the distinction that you're urging upon. Let me put it this way, then. What the Supreme Court said in footnote 20 is that the city can distinguish between different types of commercial speech. In the context of the case, I think what the Supreme Court meant was types meant on-site is one type. In fact, the Supreme Court said this in metro media. On-site is one type. Off-site is another type. But the Supreme Court went on in the same footnote in Discovery Networks to say that, and I'm paraphrasing to some extent, but the plurality did not hold that the city could distinguish between commercial and non-commercial off-site billboards that caused the same aesthetic and safety concerns. I think what the Supreme Court meant there was, in essence, it was saying if you have off-site billboards, you can't make a distinction. How do you get that out of a sentence? I'm reading right out of footnote 20. Unlike this case, referring to Discovery Networks, which involves discrimination between commercial and non-commercial speech, the off-site-on-site distinction involved disparate treatment of two types of commercial speech, referring to metro media. I read that completely the opposite of what you're saying. Your Honor, what I'm saying is I don't think by types, I don't think by types or categories, what the Supreme Court meant there was different content. I think types or categories meant on-site versus off-site. That's not a content-based distinction. That's a locational-based distinction, as the Ninth Circuit has held. It has stated that that is a location-based distinction. That's what I'm hanging my hat on here, and I guess what I'm ultimately saying, Your Honor, is how do you explain the last sentence in paragraph 20? That question was not presented in metro media, for the regulation at issue in that case did not draw a distinction between commercial and non-commercial off-site billboards, and with a few exceptions, it essentially banned all off-site billboards. Are you talking about the exceptions, Your Honor? They're essentially saying a city can provide exceptions in regulating off-site commercial speech. That's how I read that footnote. But providing exceptions, Your Honor, doesn't mean what the city is doing here and blatantly distinguishing among signs that cause the same traffic and aesthetic concerns. That's what the court said in Discovery Networks. Now, as far as the exceptions go, I think there are frankly two categories going on here. There's the off-site-on-site distinction, which was really the primary focus of the Supreme Court's decision in metro media, and then there was a list of specific exemptions that our opponents try to hang their hat, I think, on the fact that there was an exemption for real estate signs. But if you actually read that closely, that was an exemption that hewed to the on-site-off-site distinction. In other words, it was on-premises real estate signs were allowed. It wasn't off-premises real estate signs that were allowed. So the court in metro media was essentially treating like the like. Now, beyond that, the Supreme Court really didn't focus enough on any of the other exemptions, other than just to say, generally, exemptions can be allowed for that really to carry the full weight that our opponents put on it. And I think what this court needs to focus on is that in the Discovery Networks case, the court made clear that the distinction between noncommercial and commercial speech with Newsrex was content-based. And when a content-based distinction under central Hudson does not somehow relate to differing goals of the city, then it's subject to challenge, and then it is likely unconstitutional. Your argument would make sense to me if we applied strict scrutiny and treated commercial speech as if it were noncommercial speech. But if you're wrong in your hypothesis, and strict scrutiny is not the standard that we apply because we're dealing with commercial speech, doesn't that destroy your argument? No, Your Honor, not under Discovery Networks. And let me make clear, I'm not arguing here that strict scrutiny applies. In other words, I'm not saying that a content-based distinction in the context of central Hudson renders a law presumptively invalid. That's not the argument here. What I'm saying is, under the third and fourth prongs of central Hudson, it is most content-based distinctions will be problematic for precisely the reasons that the Supreme Court has stated in Discovery Networks, Greater New Orleans Broadcasting, and Rubin v. Coors. That is, it calls into question the motives or the purposes of the city in regulating in the first place. And here, there's absolutely no evidence, as I think my opposing counsel admitted, to distinguish between real estate signs and a number of the other exemptions in this code, and signs like Mr. Balance. And that's ultimately what this case comes down to. If there were, hypothetically, a reason to draw those distinctions, this would be a different case. But there's no evidence whatsoever for the city to claim that there were more real estate signs. Roberta Lewandowski stated crystal clearly that there was just no evidence to suggest that at all. Deborah Farris's declaration is not to the contrary. She did not even really observe. It's not even clear that she observed before and after. And it's not even clear that she was really comparing apples to oranges. So I don't think her declaration can carry any weight on this at all. So the best we have is- Well, we do have the photographs. The photographs at least tell us what the message was on the sign in the picture appended to the declaration. That's true, Your Honor. But what we don't know about those photographs, what I think the city is doing wrong there, is saying essentially, first, we don't know what the situation looked like before the injunction. The photographs are after the injunction. So the city is kind of comparing apples and oranges. They're saying a full ban, when you have a full ban on certain types of signs in effect, and you repeal that ban and then have nothing, no regulation whatsoever, you'll have some sandwich board signs. Well, that may be true, Your Honor, but it says nothing about this case, which is- I mean, ultimately what we're arguing is what they have to do is treat likes alike. They don't have to completely- Would the city's ban be appropriate if the exemption was only for political speech, for political signs? Your Honor, I think that that would depend- That's clearly a content-based, but it's not commercial speech. Put it this way. I don't think it would be unconstitutional. Well, I do think that under central Hudson, the city would still have to justify that distinction. But clearly, under other precedents, the Supreme Court and indeed the Supreme Court of Washington have made clear that there are certain minimal restrictions that can be put on political signs. So, I mean, I think- That would be different. Could the city of Redmond ban all signs, including political signs? I don't think that they could ban all- No, Your Honor, under the Collier, I think under the Collier case out of the Supreme Court of Washington, they could not ban political signs. But under central Hudson, I think, I don't- I mean, I guess the answer is it would really depend on the circumstances. Well, if I just understood you correctly, then they're constitutionally compelled to permit political signage. Time, place, and manner restrictions. Well, they're required to permit political signs under certain circumstances. We know under the Collier decision that they can't restrict political signs to only 60 days before an election. We also know under that case that they can require signs to be taken down within seven days, and they can put other place and manner restrictions on those signs. Beyond that, getting back to the question of whether they could ban all signs, I think there are other cases on point that would make clear that at least the city would have to justify a ban on all signs. The city of Ledoux, I think the Lindmar case, and frankly all of the commercial speech cases on which we rely, would require them to put forth a substantial interest and actually show that the ban was not broader than- It seems like the easy answer to the question was yes, the city could ban all commercial signs but permit political signs, and that really wouldn't be a problem for you, would it? Your problem is that we've got a- that the bagleries are prohibited from putting up signs and the real estate agents are allowed to put up signs. That's the crux of your argument, isn't it? That's right, Your Honor. I mean, that really does look, then, like an equal protection argument. But, Your Honor- It is content-based, and I understand you want to fit it into that pigeonhole, which is unique to the First Amendment, but it really is- you really don't want to compare yourself with political signs. You just want to compare yourself with real estate signs. Well, it's not just real estate signs. There are actually other exemptions, too. But real estate signs being a big bulk of this, that's important to you. I mean, I think that is ultimately what the case comes down to, and that is the most defensible grounds on which the district court ruled. I mean, that's the crux of the district court's opinion, that there's absolutely no reason to draw this distinction. There's no evidence on the record. Can the city of Redmond say, look, we don't want to ban all signs, and if we could get rid of half of them, that would be good. That would get us a lot farther down the road. It would make our roads safer. It would clean the place up. And let's start someplace, and an easy place to be is let's ban all the signs, but let's let real estate signs up, because real estate's important, property's unique. People can't always figure out from our regular street signs where they're going. No, Your Honor. I think that's, in essence, that's exactly what they did here. Well, it is exactly what they did here. But why haven't they at least filled at least the third prong of Central Hudson by getting rid of half the signs? They're farther down the road towards both aesthetics and safety than they were before. Well, because that's not the end of the analysis, Your Honor. I mean, that is certainly the sort of substance of the analysis that the Supreme Court applied in the Metro Media case. But in subsequent commercial speech cases, that's not the course of analysis. That would at least get us through prong number three, though, wouldn't it? I don't think it would, Your Honor, because it would be under-inclusive and because the exemptions are not explained. Even if we got rid of half the signs, that doesn't help the government's interest in cleaning things up and making things a little safer? Ultimately, the question is not whether or not we get rid of some of the signs. It's what are the grounds on distinguishing between some signs and others. But that's fourth, not third. Your Honor, if you want to look at it as the fourth prong, that's fine. That wasn't my question. Through the fourth, third, and then you're just going to get to the fourth, which is whether it's still further than necessary. There you're going to bring in all of your – I'm trying to figure out how to narrow this, Counsel, trying to get around what your argument is. I'm trying to steeple out a contestant at every step. That's fine. I mean, under the fourth prong, it would fail for two reasons. It would fail under discovery networks because it makes a content-based distinction. It would fail under the lower large tobacco case because it is a broad and sweeping restriction that bans far more signs than necessary. And notably, Your Honor, you pointed out that the city has sort of a common-sense interest in real estate signs, and certainly the Lindmark case said that real estate signs can be protected. I don't think it stands for the proposition that a city may favor real estate signs over others. But lower large tobacco makes essentially the same observation, which is that small signs located close – essentially small directional signs directing people to a retail establishment are vital to small retailers. And that was even in the context of tobacco advertising. And the Supreme Court struck down the regulation because it prevented all of those signs without ever really examining the sign ban in the context of the needs of small retailers and small businessmen. So I think it would clearly fail under lower large tobacco. Moreover, Your Honor, I think another point to make here is that the underlying premise of the city's case is that it has to ban signs, that a ban is the only option, and a ban is the only thing that they're going to consider. Notably, Your Honor, before the ordinance that we challenged went into effect, and Roberta Lewandowski admits this, and this is even in the Planning Commission report, they weren't enforcing the laws that were then on the books, that were essentially time, place, and manner laws. The problem was created not because there was something wrong with the laws that they had, but because, as she admitted, they weren't enforcing the laws. They never tried to increase penalties. They didn't try to step up enforcement. And even she made clear that when the city went out, and this is under the old ordinance, not the ordinance that we challenged. This was a time, place, and manner ordinance related to sandwich board signs. When they went out and told businesses about the regulation, when they told businesses that there were regulations that actually limited the placement of signs, in Roberta Lewandowski's words, they self-enforced. People, in other words, complied with the law when they knew about the law. I think the point there, Your Honor, is that when they actually tried to enforce the law, when they told people about the law, the law worked. On the basis of that fact testimony and those facts, there's no way, I think, that the city can justify the broad sweeping ban that arbitrarily says, essentially, we hate sandwich board signs, so let's get rid of them, but real estate signs are okay. There was just no good grounds to distinguish between those. Are you advocating going back to the old law? No. Your Honor, frankly, at this point, I think the question is answered because the city has passed a law just in December after the district court's decision came down, just this past December, that, in our view, solves the problem quite nicely. It is a non-content-based restriction based on zoning districts, so that certain districts where there's more traffic and more buildings and that sort of thing, you can have fewer signs. I think Dennis Ballin, I believe, is, under that, limited to one sign, which is what he has and which is what he has always wanted. Why isn't this case now moved?  And the nominal damages claim under Loki v. Robertson and I believe it's Bernhardt v. County of Los Angeles stands for the proposition that nominal damages will preserve a case for mootness. So we can go forward on our nominal damages. Is there any danger in your view, counsel, that the city will reenact this ordinance? Your Honor, I can't say. I mean, they have said that, certainly. They said it in the letter to the court and they said it to us. Beyond what they've said, I just have no idea that, you know, whether or not they'll do that. I mean, obviously they can't do that if this court does what we believe it should, which is rule in our favor. I believe they certainly can do that if the court rules against us, and that is part of the reason that the case is still a live controversy, but certainly the court can determine that the case is not moot because of nominal damages as well. So I think it's frankly both of those. I probably should. Can we legally say it's moot prospectively and you get your claim for nominal damages? Can we say it's moot as of December, but since the district judge ruled on your nominal damages before the December, you get your damages? No, Your Honor, because the city is still pursuing the appeal. I mean, I think the answer is that's up to the city. If they want to drop the appeal, they can, but given the fact that they're still pursuing the appeal and we still have an entitlement to a determination by this court on our nominal damages claim, I think the case is still live. One thing, though, I would say on the sort of mootness question, one argument or one point that is no longer live is their severance claim. That is, given the fact that the old ordinance is no longer the ordinance we challenged is not on the books, there's nothing left to sever. So just to clarify, I think the severance argument is now gone, but the merits appeal is still live. Your Honor, I notice my time is up. Thank you very much, Mr. Simpson. I appreciate your argument, and we'll hear from Mr. Raub in rebuttal. Thank you, Your Honor. Very briefly, I'd like to first address the mootness issue. Both parties in this case have agreed that the case is not moot, and the city's recent legislative effort in adopting new legislation governing portable signage was a direct response to the district court's summary judgment order, and it is the city's formally stated intent to reenact the previous ordinance, the one that was challenged in 2003, if the city prevails in this appeal. But isn't the new one a model for permitting the equal access to both kinds of commercial speech? The new ordinance was the city's response to the district court's invalidation of its previous ordinance. It's not the ordinance that the city prefers to have, and the city, again, reiterates its intent to readopt its previous regulations if we are successful here. How does the new one hurt you? Your Honor, it doesn't provide the same type of ban and prohibition upon the type of signs that the city has addressed as being problematic from both a traffic safety and an aesthetic standpoint, and it does allow a greater volume of signs just by virtue of its zoning-based approach. Again, the city does reiterate its intent to reenact its old ordinance, and I believe that that should address the mootness issue. So essentially what you're saying is that the city determined that some regulation was better than no regulation at all, that it would limit to some degree the proliferation of signs, but if it had its druthers, it would go back to the old ordinance and restrict them even further. That's absolutely correct, Your Honor. And just to briefly respond to some of the issues raised by opposing counsel, again, we strongly believe that the Metro Media decision controls this case, and if Metro Media has been overruled, where is the case that overrules it? None has been cited to this court. Metro Media at its core holding allows a city to establish a ban on a particular type of signage and allows it to have exemptions to that ban. Notably, the Rubin v. Coors Brewing Company case and the Discovery Networks case and the Greater New Orleans case that were relied upon heavily by the appellees in this matter and cited by the district court have nothing to do with signs. We're not dealing here with news racks on sidewalks or beer label advertisements or radio advertisements. We're dealing with outdoor advertising, and Metro Media and its lengthy progeny should control as a matter of law. With respect to the statistical proof issue under the Central Hudson third prong, the Lorillard tobacco case referenced by counsel went on to explain that the city does not need to justify its regulations with statistical proof. The city can rely on the experiences of other municipalities, it can rely on anecdotal evidence, and it can rely on simple common sense. And I would respectfully submit to the court that if cities can rely on those type of factors, they can clearly rely on judicial precedent from the United States Supreme Court. And disregarding that essentially turns the whole concept of precedent on its head. We heard from the appellees about their attempt to impose some sort of a content neutrality requirement upon the Central Hudson standard. That attempt has no basis in case law. There is no controlling case that I'm aware of that requires a commercial speech regulation, particularly one aimed at the secondary impacts of the speech rather than the speech itself, to allow content neutrality. And that simply is, I think, the core fallacy of the appellee's argument in this matter. Well, if we don't talk about content neutrality, if they talk about the fourth prong, the overbreadth, that it doesn't accomplish the point that if you're driving down the street and you're distracted by a real estate sign and you get into a traffic accident, that's just as bad as you're driving down the street and you decide you want to go in for bagels. And they actually have a good reason why they needed the sign, because of the history of their unique establishment. Again, Your Honor, this goes back to the content neutrality issue and to the under-inclusiveness challenge. And I think that we've hopefully demonstrated to the Court that jurisdictions across the nation have almost uniformly rejected this type of challenge. As long as the regulation at issue directly advances the city's goals, the fact that it may be under-inclusive and doesn't encompass all of the problematic articles is not fatal. That's a statement in the case law that repeats itself consistently. The last issue I'd like to address, Your Honor, is under the fourth prong, and this is the criteria of central Hudson that examines the extent to which the challenge regulation may reach further than necessary to accomplish the city's goals. I think that the district court misapplied that prong in focusing on the alleged other means by which the city could advance its regulatory purposes. That is not the appropriate approach under central Hudson. The fact that there may be alternative methods of regulation is one factor that the Court may consider, but the Supreme Court has gone out of its way repeatedly to reiterate that the city is not required to choose the least restrictive means. And I think that this ties in with the Metro Media decision, which, again, we believe is directly on point. The Court there, in analyzing the fourth prong of central Hudson, clearly stated that in the context of outdoor advertising, if the city has reason to believe that signs are problematic, then the only way of addressing that problem is through a ban or a prohibition. That's what the city of Redmond has done here. The fact that it has adopted a few limited exemptions to that general rule simply recognizes, A, that the city is honoring a constitutional mandate to protect political and noncommercial speech, or, B, that the city's own regulatory interests happen to be outweighed in this limited context by, for example, real estate signage. I don't believe that that undercuts the city's position, and the case law that we've cited reaffirms that. All right. Thank you very much, Mr. Rouleau. I've let you go on for some time now, and with that, we'll leave that as your last argument. The case just argued this event. I want to thank both parties for an excellent argument. You've helped the court, and hopefully we'll get you an answer as soon as we can.
judges: Tallman, Bybee, Huff